IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AMERICAN GUARDIAN WARRANTY
SERVICES, INC., and AMERICAN
GUARDIAN FUNDING CORPORATION,

              Plaintiffs,

        v.

JCR-WESLEY CHAPEL, LLC;
JESUS ROSARIO; and CYNTHIA
ROSARIO,

              Defendants.

Case No. 16 C 11407

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiffs' Motion to Dismiss
Defendants' Counterclaims [ECF No. 34] and Motion for a
Preliminary Injunction [ECF No. 27]. For the reasons stated
herein, the Motions are denied.

## I.  FACTUAL BACKGROUND

This litigation revolves around a contractual relationship
between Illinois-based providers of automobile warranty services
and a Florida car dealership. Plaintiff American Guardian
Warranty Services, Inc. ("AGWS") provides warranty-related
services to dealerships, and Plaintiff American Guardian Funding
Corporation ("AGFC") finances warranty arrangements with car
dealerships (referred to collectively as "American Guardian").
Defendants are such a dealership, JCR-Wesley Chapel, LLC

("JCR"), and its two owners, Jesus Rosario ("Rosario") and Cynthia Rosario.

JCR entered into a master agreement with AGWS to cover provision of warranties to JCR customers ("the Dealer Agreement"). The Dealer Agreement, *inter alia*, makes it AGWS's responsibility to investigate, administer, and approve payment of all claims under American Guardian contracts sold by JCR. (ECF No. 40 ("Am. Compl.") at Ex. A, § V.3(a).) It also obligates AGWS to secure insurance policies indemnifying JCR or AGWS against all sums that either may become obligated to pay according to the terms of such a contract. (*Id.* § V.1.) Under the Dealer Agreement, AGWS files for and administers reimbursement to JCR for the cost of valid repairs. (*Id.* § V.3(c).) In addition, the Dealer Agreement contains an "Entire Agreement" clause and a modification clause, the latter requiring any amendments to the contract to be "supplemented by writing executed by all parties." (*Id.* § VII.6.) The parties signed the Dealer Agreement on or about November 7, 2013.

The parties executed subsequent addenda to the Dealer Agreement, referred to as Production Agreements. Specifically, a December 15, 2015 Production Agreement (the "Production Agreement") required JCR to sell a minimum number of warranty and service contracts (the "American Guardian contracts") each

month for a five-year period and also mandated that 95 percent of the warranty and service contracts it sold during that period be American Guardian contracts (the "exclusivity" provision). (Am. Compl. at Ex. E ¶¶ 1, 7.)  As part of the funding deal, the parties also entered into promissory notes to document advances of funds made to JCR that the latter was projected to earn through its sale of American Guardian contracts, including a December 15, 2015 promissory note (the "Promissory Note").

After no small degree of corrosion, the relationship between the parties broke down.  In 2016, JCR ceased selling American Guardian contracts, and Rosario approached Plaintiffs' agent, Dave Stewart ("Stewart"), seeking to pay off JCR's outstanding loan balance under the Promissory Note. (ECF No. 44 ("Am. Ans.") ¶ 19, 20, 29.)  Instead, Plaintiffs sued for breach of contract in Illinois state court.  After Defendants successfully removed the case to this Court, Plaintiffs moved for a preliminary injunction.  Defendants counterclaimed for fraud in the inducement and JCR counterclaimed for breach of contract against AGWS.  Plaintiffs then moved to dismiss these counterclaims.

## II.  <u>ANALYSIS</u>

### A.  Plaintiffs' Motion to Dismiss

#### 1.  *Legal Standard*

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted.  In ruling on such a motion, the Court accepts as true all well-pleaded facts in the relevant complaint and draws all reasonable inferences from those facts in the non-movant's favor.  *Active Disposal, Inc. v. City of Darien,* 635 F.3d 883, 886 (7th Cir. 2011); *Dixon v. Page,* 291 F.3d 485, 486 (7th Cir. 2002).  To survive a Rule 12(b)(6) motion, "the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Independent Trust Corp. v. Stewart Information Servs. Corp.,* 665 F.3d 930, 934 (7th Cir. 2012) (internal quotation marks omitted); *see also, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  The allegations in the complaint must "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  A claim has facial plausibility when the plaintiff pleads factual content sufficient for the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Iqbal,* 556 U.S. at 677-78.  The issue is

not whether the claimant will ultimately prevail but whether it is entitled to offer evidence to support the claims. *AnchorBank, FSB v. Hofer,* 649 F.3d 610, 614 (7th Cir. 2011) (quotation omitted).

Allegations of fraud are subject to the Federal Rules' heightened pleading standard, which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). This means that the plaintiff must plead the "who, what, when, where, and how of the fraud – the first paragraph of any newspaper story." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.,* 631 F.3d 436, 441-42 (7th Cir. 2011) (citations and internal quotation marks omitted). Rule 9(b) should be applied in view of its underlying purposes: "(1) to inform the defendants of claims against them and to enable them to form an adequate defense; (2) to eliminate the filing of a conclusory complaint as a pretext for using discovery to uncover wrongs; and (3) to protect defendants from unfounded charges of fraud which may injure their reputations." *Fujisawa Pharm. Co., Ltd. v. Kapoor,* 814 F.Supp. 720, 726 (N.D. Ill. 1993).

## 2. Discussion

### a. The Fraud Counterclaim

For their fraudulent inducement counterclaim, Defendants allege that Stewart, as Plaintiffs' agent, met with Rosario in the latter's office sometime between October 1, 2013 and November 7, 2013. (Am. Ans. at Ctrclm. ¶ 9.) At this meeting, Stewart represented that Plaintiffs would set up for JCR's benefit an "offshore reinsurance company" that would allow JCR to both retain the warranty payments paid by customers with American Guardian contracts (rather than those payments going to an unaffiliated insurance company) and earn investment income on them. (*Id.* ¶¶ 9-11.) Defendants go on to allege that "Plaintiffs made this statement to Defendants on other occasions" during the same timeframe. (*Id.* ¶ 12.) They assert that both Stewart and Plaintiffs knew this statement was false and offered it to induce Defendants to enter into a business relationship. (*Id.* ¶¶ 13-15.) Further, Defendants allege that Stewart repeated this representation to Rosario in 2013 and 2014. (*Id.* ¶ 17.)

Defendants claim reasonable reliance on the promise of an "offshore reinsurance company" and that they would not have entered into the Dealer Agreement or the later Production Agreement but for these representations. (Am. Ans. at Ctrclm.

¶¶ 16, 20.)  In early 2016, Defendants confronted Stewart about the lack of progress on the promised reinsurance company, and were told that Plaintiffs had simply been "warehousing" the warranty payments with no intention of setting up the reinsurance company for JCR's benefit. (*Id.* ¶ 18.)  At least partly because Plaintiffs scotched the reinsurance company proposal (*compare, id.* ¶ 19; *with*, *id.* ¶ 29), Rosario sought to terminate Defendants' relationship with Plaintiffs.  As damages, Defendants point to their "lost profits from warranty payments that would have been retained by a reinsurance company and lost investment earnings on those warranty payments." (*Id.* ¶ 20.)

Plaintiffs exhort the Court to dismiss Defendants' fraud counterclaim for two reasons.  First, Plaintiffs contend that it fatally lacks the allegations necessary to plead the substantive elements of fraud.  Second, invoking Rule 9(b)'s heightened pleading standard, they cry foul at a perceived lack of specificity in Defendants' fraud allegations.  For the reasons explored below, the Court finds neither objection well-taken.

## I.  Substantive Fraud Elements

As a matter of Illinois law, fraudulent inducement is a form of common-law fraud.  *See, e.g., Beaton v. SpeedyPC Software,* No. 13 C 8389, 2014 WL 4376219, at *3 (N.D. Ill. Sept. 2, 2014) (citation omitted).  To state a claim for common-

law fraud in Illinois, a complaint must allege that the defendant "(i) made a false statement of material fact; (ii) knew or believed the statement to be false; (iii) intended to and, in fact, did induce the plaintiff to reasonably rely and act on the statement; and (iv) caused injury to the plaintiff." *Reger Dev., LLC v. National City Bank,* 592 F.3d 759, 766 (7th Cir. 2010) (citing *Redarowicz v. Ohlendorf,* 441 N.E.2d 324, 331 (Ill. 1982)); *accord, Connick v. Suzuki Motor Co., Ltd.,* 675 N.E.2d 584, 591 (Ill. 1996). Plaintiffs contend that Defendants' counterclaim fails to satisfy the first and third elements.

### i.  False Statement of Material Fact

Plaintiffs spill considerable ink protesting that representations of intent regarding future conduct, such as the challenged statements here, are not actionable as fraud. That is not entirely true. They are not actionable *per se* as fraud in the inducement but may be actionable as promissory fraud if Defendants adequately allege a "scheme to defraud." *Association Ben. Servs., Inc. v. Caremark RX, Inc.,* 493 F.3d 841, 853 (7th Cir. 2009) (citations omitted); *accord, Continental Bank, N.A. v. Meyer,* 10 F.3d 1293, 1298 (7th Cir. 1993). A temporal element demarcates the two causes of action:  the "tense" of a statement determines whether a court views the statement as

invoking promissory fraud (future) or fraud in the inducement (past or present). *Triumph Packaging Grp. v. Ward,* 877 F.Supp.2d 629, 645 (N.D. Ill. 2012); *accord, Steinberg v. Chi. Med. Sch.,* 371 N.E.2d 634, 641 (Ill. 1977). Where a party purports to bring a claim for fraud in the inducement, courts nevertheless treat the claim as one for promissory fraud if it is more accurately characterized as such under state law. *Swervo Enter. Grp., LLC v. Mensch,* No. 16 C 4692, 2017 WL 1355880, at *5 (N.D. Ill. Apr. 13, 2017) (citing *Triumph,* 877 F.Supp.2d at 644-46) (citations omitted).

The "scheme to defraud" necessary to sustain a promissory fraud action under Illinois law typically consists of "'a pattern of fraudulent statements, or one particularly egregious fraudulent statement.'" *Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 570 (7th Cir. 2012) (quoting *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC,* 664 F.3d 131, 136 (7th Cir. 2011)). Defendants also must sufficiently allege that, at the time the promise was made, Mr. Stewart (as Plaintiffs' agent) did not intend to fulfill it, by pointing to specific, objective manifestations of the promisor's fraudulent intent. *Wigod,* 673 F.3d at 570 (citations omitted); *Bower v. Jones,* 978 F.2d 1004, 1011 (7th Cir. 1992).

Here, Defendants have stated a claim for promissory fraud under Illinois law by alleging that Plaintiffs never intended to keep the promise, delivered at least via Stewart, to set up an offshore reinsurance company for JCR's benefit. Defendants support this claim by alleging specific, objective manifestations of fraudulent intent not to keep the promise at the time it was made. For one, they aver that even after the Dealer Agreement was signed, Stewart repeatedly used the same prospect of a reinsurance company holding warranty payments and earning investment income on leftover premiums to "lull" Defendants into continuing to sell American Guardian warranties. *Lane v. Le Brocq,* No. 15 C 6177, 2016 WL 5955536, at *6-7 (N.D. Ill. Oct. 12, 2016) ("[O]ver time Lane lulled him into working at the firm with the understanding that he had her blessing to leave at any time to further his own career goals, even though this was never her intent[.]"); *see also, Advanced Ambulatory Surgical Center, Inc. v. Cigna Healthcare of Illinois,* No. 13 C 7227, 2014 WL 4914299 (N.D. Ill. Sept. 30, 2014) (Leinenweber, J.) (permitting promissory fraud claim where the plaintiff alleged that the defendant made multiple similar misrepresentations about reimbursements for its services). For another, Defendants allege that Stewart informed them in early 2016 that Plaintiffs had not set up the reinsurance company, had

instead been "warehousing" the warranty payments, and would not set up the reinsurance company for Defendants in the future.

Whether conceptualized as multiple promises or a particularly egregious single promise, reiterated in similar form time after time for years and always absent intent to honor it, the scheme Defendants allege successfully invokes the promissory fraud exception.

Thus, Defendants' counterclaim, properly styled as one for promissory fraud, adequately invokes the "fraudulent scheme" exception to the general Illinois prohibition on recovery for promises of future conduct.

ii. Reasonable Reliance on the False Statement

Plaintiffs argue that the Dealer Agreement's "Entire Agreement" clause precludes Defendants from successfully alleging reasonable reliance. Because that provision expressly "supersedes any and all previous agreements, negotiations or understandings, written or oral, between the parties," they assert that no cause of action for fraud can lie based on their or their agent's prior statements. Plaintiffs appear to have confused the legal effect of an integration clause with that of a no-reliance clause. The former does not bar a fraud claim based on prior statements; the latter does.

Under Illinois law, "an integration clause does not bar a claim of fraud based on statements not contained in the contract." *Vigortone AG Prods.*, *Inc. v. PM AG Prods., Inc.,* 316 F.3d 641, 644 (7th Cir. 2002). Rather, to prevent fraud suits, contractual parties may "insert a 'no-reliance' clause into their contract, stating that neither party has relied on any representations made by the other." *Id.* (citing *Rissman v. Rissman,* 213 F.3d 381, 383-84 (7th Cir. 2004)) (citations omitted). No-reliance clauses explicitly provide that neither party to the agreement has relied on representations made by the other party except for those contained within the terms of the contract. *See, Vigortone,* 316 F.3d at 644. Because reliance is an element of fraud, an enforceable no-reliance clause will preclude a fraud suit. This makes good sense: whereas integration clauses are creatures of contract law that limit the use of parole evidence in a contract dispute, fraud is a tort. As such, an integration clause "has nothing to do with whether the contract was induced . . . by fraud." *Id.*

The only way that the Dealer Agreement's "Entire Agreement" clause could on reliance grounds bar Defendants' fraud counterclaim is if in substance, if not in form, it is a no-reliance clause. But that reading of the provision is baseless, and, perhaps as a result, Plaintiffs do not seriously push for

it. The language of the brief provision reads: "This Agreement is the entire Agreement between the Parties, and supersedes any and all previous agreements, negotiations or understandings, written or oral, between the parties." (Am. Compl. at Ex. A § VII.5.) Plainly, this is a garden variety integration clause that "contains no reference to reliance." *Vigortone,* 316 F.3d at 645; *see also, Mukite v. Advocate Health and Hospitals Corp.,* No. 15 C 7604, 2016 WL 4036755, at *5-6 (N.D. Ill. July 28, 2016) (holding that a similar "Entire Agreement" provision was a classic integration clause); *Dolmage v. Combined Ins. Co. of Am.,* No. 14 C 3809, 2016 WL 754731, at *5 (N.D. Ill. Feb. 23, 2016) (same); *Royce v. Michael R. Needle, P.C.,* No. 15 C 259, 2016 WL 393147, at *4 (N.D. Ill. Feb. 2, 2016) (same). It is easily distinguishable from those provisions held to be no-reliance clauses. *See, e.g., Extra Equipamentos E Exportacado Ltda. v. Case Corp.,* 541 F.3d 719, 730 (7th Cir. 2008) ("No Reliance On The Other Party: Both parties represent and warrant . . . they are relying on their own judgment, belief and knowledge. . . . The parties are not relying on representations or statements made by the other party [except as expressed herein]. . . ."); *Rissman,* 213 F.3d at 383 ("[T]he parties further declare that they have not relied on representation of any party [and that this Agreement is executed] freely and

voluntarily, and without reliance upon any statement or representation [except as set forth herein].").

Even if a no-reliance clause need not expressly use the word "reliance," critically absent from the Dealer Agreement is any language suggesting that the parties contracted in a vacuum, without regard to prior representations. *See, e.g., In re Kindra Lake Towing, L.P.,* No. 15 C 3174, 2016 WL 3227303, at *2-3 (N.D. Ill. June 13, 2016) (finding that a party subjected itself to a no-reliance clause by agreeing that its counterparty made no representation regarding the seaworthiness of a barge, the sinking of which prompted misrepresentation claims). Contrary to Plaintiffs' bald assertion, Defendants did not "agree[] in writing that they did not rely on any representations found outside the agreement." (ECF No. 48 ("Pls.' Reply") at 5.) Put simply, the "Entire Agreement" clause does not warrant, represent, declare, or acknowledge that the parties disregarded as immaterial any and all representations outside those set forth in the Dealer Agreement.

Finally, the circumstances of the parties' dealings do not brook any argument that Defendants' reliance on American Guardian's alleged representations was unjustifiable. Unlike the situation in *One-O-One Enters., Inc. v. Caruso,* 848 F.2d 1283 (D.C. Cir. 1988) (R.B. Ginsburg, J.), the parties do not

appear to have included the promise at issue in preliminary written drafts and then, in the face of an integration clause, affirmatively excised it from the final agreement. *See, id.* at 1287 (citing *Kardios Sys. Corp. v. Perkin-Elmer Corp.,* 645 F.Supp. 506, 509-10 (D. Md. 1986) (removal of best efforts provision from final agreement constituted affirmative excision of this term)); *see also, Rissman,* 213 F.3d at 388 (Rovner, J., concurring) ("[T]he [*One-O-One*] court noted that the parties reached the written agreement after eight months of vigorous negotiations involving many [written] offers, promises and representations, and that the integration clause was included to avoid misunderstandings as to what was agreed upon in the course of those extensive negotiations."). Nor can Defendants be said to have closed their eyes to a known or obvious risk, or ignored a "manifest danger." *Vigortone,* 316 F.3d at 645-56 (citations omitted); *see also, Wigod,* 673 F.3d at 569 (noting that justifiable reliance obtains under Illinois law when it was reasonable to accept the statements "without an independent inquiry or investigation") (internal quotation marks omitted). The alleged promise to set up a reinsurance company does not appear so clearly bound up with the subject matter of the Dealer Agreement or the risks of selling warranties that its absence should have triggered a warning light. Defendants' reliance was

all the more justified if, as Plaintiffs claim, they routinely offer to set up a reinsurance company for their dealer customers. (*See,* Pls.' Reply at 7-8.)  At the very least, the Court "cannot determine, at this stage in the litigation, that 'no trier of fact could find that it was reasonable to rely on the alleged statements' or that 'only one conclusion can be drawn.'"  *Triumph,* 877 F.Supp.2d at 647 (quoting *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.,* 250 F.3d 570, 574 (7th Cir. 2001)).

Drawing inferences in Defendants' favor, the Court finds that neither the Dealer Agreement's integration clause nor the surrounding circumstances render unjustifiable Defendants' claimed reliance on Plaintiffs' alleged promise to set up a reinsurance company.  Defendants therefore adequately plead the substantive elements of promissory fraud under Illinois law.

## II.   Rule 9(b)

Plaintiffs do not dispute that Defendants adequately plead the "who" (at least Stewart on behalf of Plaintiffs), "where" (at least Rosario's office), and "what" and "how" (an oral promise of an "offshore reinsurance company" for JCR as an investment vehicle for warranty premiums, thus sweetening the Dealer Agreement) of the alleged fraud. (Although Defendants' counterclaim does implicate multiple (*i.e.,* two) counter-

defendants, it "inform[]s each defendant of the nature of his alleged participation in the fraud" by "identify[ing] with particularity the actors who participated" in the scheme – namely, Stewart – and by alleging his status as an agent for both Plaintiffs. *Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 777-78 (7th Cir. 1994) (citations and internal quotation marks omitted).) Indeed, Plaintiffs appear to fault only the "when" allegations for lack of particularity, arguing that the October 1, 2013 through November 7, 2013 timeframe of the alleged statements is insufficiently particular.

But a "when" challenge under Rule 9(b) is equally ill-fated, because Defendants need not state exact dates on which Stewart allegedly made the representations. *See, e.g., Prince-Servance v. BankUnited*, *FSB,* No. 07 C 1259, 2007 WL 3254432, at *6 (N.D. Ill. Nov. 1, 2007) (finding "general allegations as to time" sufficient to comply with Rule 9(b) where the "who" and "what" of the fraud clam were pled with "great specificity"); *U.S. ex rel. Yannacopolous v. General Dynamics,* 315 F.Supp.2d 939, 945-46 (N.D. Ill. 2004) (qualifying the two asserted cases in which courts required the pleader to allege specific dates under Rule 9(b)); *Heller Bros. Bedding, Inc. v. Leggett & Platt, Inc.,* No. 01 C 3409, 2001 WL 740514, at *3 (N.D. Ill. June 28,

2001) ("[T]he fact that Heller Bros.' complaint fails to cite the exact dates of the alleged misrepresentations does not warrant dismissal. Heller Bros. identifies *the general time frame* in which the alleged misrepresentations occurred. This is sufficient for purposes of Rule 9(b).") (emphasis added) (citation omitted); *Pucci v. Litwin,* 828 F.Supp. 1285, 1297 (N.D. Ill. 1993) ("Furthermore, plaintiffs need not precisely identify the timing of each allegation 'but merely an appropriate time frame.'") (citation omitted); *Hernandez v. Childers,* 736 F.Supp. 903, 912 (N.D. Ill. 1990) (noting that the time requirement is not exact and requires only "an appropriate time frame"); *Caliber Partners, Ltd. v. Affeld,* 583 F.Supp. 1308, 1310-12 (N.D. Ill. 1984) (finding "spring 1981" adequate as a time frame under Rule 9(b)). As these cases make clear, the timeframe of just over one month that Defendants allege suffices to meet the "when" prong of Rule 9(b).

As such, the Court finds Defendants' counterclaim sufficiently particular to satisfy the strictures of Rule 9(b).

\*   \*   \*

For these reasons, Plaintiffs' Motion to Dismiss is denied with respect to Defendants' fraud counterclaim.

### b. Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing

JCR's counterclaim alleges that Section V.3 of the Dealer Agreement obligates AGWS to "investigate, administer, and approve payment of all claims under [American Guardian] Contracts sold by the Dealer." (Ctrclm. ¶ 22; Am. Compl. at Ex. A § V.3(a)-(b) (also providing for a "claims payment and control system").) Inherent in this provision, JCR avers, is AGWS's obligation to monitor payment of all claims to ensure that JCR was not taking excessive losses on payments for warranted repairs. JCR alleges that, between October 1, 2013 and November 7, 2013, Stewart orally explained that the lodestar for whether JCR's loss ratio was excessive would be "the average loss ratio for Nissan dealerships throughout the United States." (Ctrclm. ¶ 23.) In 2015, JCR informed AGWS that it had experienced excessive losses based on its failure to monitor the claims of its customers. (*Id.* ¶ 25.) AGWS eventually "admitted" failure to correct the problem. (*Id.* ¶ 26.) Ergo, the gravamen of Defendant JCR's contract counterclaim is that Plaintiff AGWS breached the Dealer Agreement vis-à-vis the covenant of good faith and fair dealing by failing to monitor the dealership's loss ratio on claims made by its customers on American Guardian contracts.

To state a breach-of-contract counterclaim under Illinois law, Defendants must allege "(1) the existence of a valid and enforceable contract; (2) substantial performance by [Defendants]; (3) a breach by [Plaintiffs]; and (4) resultant damages." *Reger Dev.,* 592 F.3d at 764. Every contract contains an implied covenant of good faith and fair dealing between the parties. However, the implied covenant is not an independent source of duties and cannot stand as a separate counterclaim. *Echo, Inc. v. Whitson Co., Inc.,* 121 F.3d 1099, 1105-06 (7th Cir. 1997). Instead, the implied covenant guides interpretation of the contract's express terms. *See, e.g., Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1443 (7th Cir. 1992); *accord, Seip v. Rogers Raw Materials Fund, L.P.,* 948 N.E.2d 628, 637 (Ill. App. 2011) (citation omitted). Where the contract at issue vests one of the parties with discretion in performing an obligation, and that party exercises such discretion in bad faith, unreasonably, or in a manner inconsistent with the reasonable expectations of the parties, it breaches the implied covenant of good faith and fair dealing. *Hickman v. Wells Fargo Bank N.A.,* 683 F.Supp.2d 779, 792-93 (N.D. Ill. 2010). The implied covenant does not alter the express terms of a contract but, "[w]hen the contract is silent, principles of good faith . . . fill the gap." *Kham & Nate's Shoes No. 2, Inc. v.*

*First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir. 1990) ("'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.").

AGWS's sole challenge is a damages one – namely, that JCR failed to plead actual damages because "[a]ny excess or improper payment of claims would result in damage to Plaintiffs," not JCR, as only AGWS was responsible for payment on claims. (ECF No. 36 ("Pls.' Mem.") at 10; Pls.' Reply at 9.) Reprising a persistent theme, this argument ignores relevant language in the Dealer Agreement. (*See, e.g.,* Am. Compl. at Ex. A § 5.1 (obligating AGWS to secure insurance "indemnifying the Dealer or AGWS, according to the terms and provisions of said insurance policy, against all sums *which Dealer or AGWS shall become obligated to pay for repairs*") (emphasis added); *id.* § 5.3(c) ("AGWS shall file for, and administer, *reimbursement to the Dealer* (or the repairing facility if other than the Dealer) from the Dealer's or AGWS' Insurance Company for the cost of valid repairs or replacements, rental car expense, towing expense, and other covered expense arising under Contracts sold by Dealer. . . .") (emphasis added).) Thus, the Dealer Agreement contemplates both parties making payments for repairs and other

expenses incurred under warranty claims by JCR's customers. And, in any event, Defendants' fraud counterclaim (incorporated into JCR's breach of contract counterclaim) renders the argument frivolous. To the extent AGWS was "responsible for payment on claims," this responsibility was nominal whenever JCR's warehoused premiums paid the cost of repairs.

So JCR's counterclaim is not deficient with respect to damages. But does it otherwise state a valid claim for breach of contract? The answer turns on whether the express terms of the contract, which make AGWS the clearinghouse for all claims administration (including investigation, indemnification, and reimbursement); support a plausible argument that it materially breached these obligations by failing to monitor "competently" the extent of JCR's losses. AGWS makes no argument relevant to this issue in its Rule 12(b)(6) motion. It is precisely because of Plaintiffs' misapprehension of many of the salient issues that the Court feels compelled to prime this pump for later in the litigation.

Consider first a few of the intricacies at play. The express terms of the Dealer Agreement do not appear to obligate AGWS to monitor JCR's losses to ensure a ratio that accords with those of other U.S. Nissan dealerships. Rather, the Dealer Agreement provides that AGWS is to "investigate, administer, and

approve payment of all claims"; to "file for, and administer, reimbursement to the Dealer"; and to "establish with the Dealer a claims payment and central system." Implied in these obligations of AGWS, JCR contends, is a covenant to monitor competently its loss ratio and inform the dealership if it was losing excessive amounts of money in the aggregate. JCR claims that this understanding was all the more reasonable in light of representations made by Stewart to Rosario that AGWS would perform this service. However, because this is its breach-of-contract and not Defendants' promissory fraud counterclaim, JCR cannot rely on extrinsic evidence (namely, Stewart's representation to this effect) in the face of the agreement's integration clause. (Hence, presumably, JCR's invocation of the implied covenant of good faith and fair dealing in its breach-of-contract counterclaim.)

The salient question, then, is whether any party would grant its counterparty absolute discretion over the monitoring and investigation of all claims while permitting the liberties AGWS allegedly took with these obligations. Drawing inferences from the pleadings in JCR's favor, the Court thinks not and believes it unlikely that any dealership would enter into the Dealer Agreement without some means of assuring that, over the life of the five-year agreement, selling warranties would not

become an excessively costly lemon. It is therefore plausible that AGWS "took opportunistic advantage of [D]efendants, dashed their reasonable expectations, and abused any discretion the contract may have afforded," *LSREF3 Sapphire Trust 2014 v. Barkston Props., LLC,* No. 14 C 7968, 2016 WL 302150, at *3-4 (N.D. Ill. Jan. 25, 2016); *see also, Kham & Nate's,* 908 F.2d at 1357, thereby forestalling (earlier) termination of the agreement pursuant, for example, to the Dealer Agreement's mutual termination provision. (Am. Compl. at Ex. A § VI.)

Drawing inferences in favor of JCR (the non-movant), it is plausible on the facts alleged that AGWS breached Section V of the Dealer Agreement, interpreted in light of the duty of good faith and fair dealing, to monitor competently JCR's losses. The standard of review here is too deferential to JCR for the sort of *sua sponte* dismissal required to nix this counterclaim. Recall that AGWS did not make such an argument, instead choosing to attack JCR's (adequate) damages allegations. As such, the Court denies AGWS's Motion to Dismiss in relevant part.

\*    \*    \*

For all the above reasons, the Court denies Plaintiffs' Motion to Dismiss for failure to state a claim.

## B. Plaintiffs' Motion for a Preliminary Injunction

### 1. Legal Standard

Like all forms of injunctive relief, a preliminary injunction is "an extraordinary remedy that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (emphasis in original); *accord, Goodman v. Ill. Dept. of Fin. & Prof. Reg.,* 430 F.3d 432, 437 (7th Cir. 2005). A party seeking a preliminary injunction must demonstrate as a threshold matter that (1) its case has a better than negligible chance of success on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm in the period before final resolution of claims. *See, Jones v. Markiewicz-Qualkinbush,* 842 F.3d 1053, 1058 (7th Cir. 2016); *D.U. v. Rhoades,* 825 F.3d 331, 338 (7th Cir. 2016); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.,* 549 F.3d 1079, 1096 (7th Cir. 2008). If the movant shows all of the requisite factors, then the court will weigh the factors against one another, assessing whether the balance of harms favors the movant or whether the harm to other parties or the public is too severe to support issuance of the injunction. *Jones,* 842 F.3d at 1058 (citing *ACLU of Ill. v. Alvarez,* 679 F.3d 583, 589 (7th Cir. 2012)); *accord, Storck USA, L.P. v. Farley Candy Co.,* 14 F.3d 311, 314 (7th Cir. 1994).

## *2. Discussion*

Plaintiffs move for a preliminary injunction restraining Defendants from offering for sale or selling vehicle service contracts and related warranty products of American Guardian's competitors (although JCR appears to be the only entity selling warranties; the Rosarios are merely members of the LLC). Certain facts are uncontested.

In May 2016, after significant wear-and-tear on the parties' relationship (see above), Stewart informed Defendants that Plaintiffs would excuse JCR's remaining contractual obligations if it satisfied its total production requirement under the Production Agreement. (*See, e.g.,* ECF No. 46 ("Defs.' Br.") at Ex. B ¶ 6; Am. Ans., Third Affirmative Defense.) In early October 2016, JCR ceased selling American Guardian contracts; by late October 2016, it was exclusively selling warranty and service contracts provided by American Protection Corporation ("APCO"). (ECF No. 27 ("Pls.' Mot.") at Ex. 4 ¶¶ 5-7.)

Plaintiffs brought this lawsuit in Illinois state court on November 17, 2016, seeking an exact amount of money damages - $207,888.00 plus interest and fees for amounts allegedly owing under the Dealer Agreement, $489,508.92 plus interest and fees for breach of the Promissory Note, and $9,939,212.00 for breach

of the Production Agreement. (ECF No. 1 ("Not. of Removal") at Ex. A.) Plaintiffs made no claim for injunctive relief in their original Complaint. Defendants removed the case to federal court on December 16, 2016, and on January 23, 2017, Rosario initiated a payment of $489,508.92 to Plaintiffs in satisfaction of Defendants' obligations under the Promissory Note. (Defs.' Mot. at Ex. A ¶ 10.) About two weeks later, on February 8, 2017, this Court denied Plaintiffs' Motion to Remand. (ECF Nos. 23-24.) On February 17, 2017 – three months after they originally sued Defendants in state court, and approximately four months after JCR began selling APCO warranties – Plaintiffs moved to amend their Complaint to add a count requesting a preliminary injunction based on JCR's sales of a competitor's warranty products. (ECF No. 25.) Plaintiffs excuse this delay by claiming that they did not learn of JCR's sales of APCO warranties until February 2017. (Pls.' Reply at 7.)

> *a.  Likelihood of Success on the Merits*

With respect to success on the merits, Plaintiffs seek to undermine two of Defendants' defenses to contract enforceability and excuses for breach. (Recall that the Production Agreement was an addendum incorporated into the Dealer Agreement.) First, they claim that Rosario knew how to set up a reinsurance company, as evidenced by JCR's eventual creation in 2016 of such

a company, and effectively prevented its earlier formation by failing to file the relevant documents. This argument appears directed to whether the Dealer Agreement (and thus the incorporated Production Agreement) is voidable for fraud. Second, Plaintiffs apparently argue that, because the majority of claims submitted on their products during the relevant timeframe came from JCR and because Defendants were properly reimbursed, Plaintiffs have shown a likelihood of overcoming the defense that they materially breached by failing to monitor competently JCR's loss ratio.

The Court need not engage the first of Plaintiffs' arguments because the second – directed to the defense of justified or excusable breach – does nothing to rebut the enforceability concerns Defendants have raised. *See, e.g., Carlson Group, Inc. v. Davenport,* No. 16 C 10520, 2016 WL 7212522, at *4 (N.D. Ill. Dec. 13, 2016) ("[T]he Court agrees with Defendants that enforceability concerns related to the contractual provisions under which [Plaintiffs have] sued . . . preclude [Plaintiffs] from demonstrating 'some likelihood of success' on [their] contract claim.") (quotation omitted). In any event, Plaintiffs have said nothing about a likelihood of prevailing on Defendants' further defenses that

find support in the undisputed facts, such as estoppel and accord and satisfaction.

Regardless of whether JCR could lose on the merits of its argument that AGWS breached the Dealer Agreement by failing to monitor JCR's loss ratio on the warranty contracts, the evidence Plaintiffs have submitted on their motion for a preliminary injunction does not speak to that eventuality at all. Instead, assembled for the Court are only JCR's unrebutted allegations juxtaposed with Plaintiffs' argument for success on the merits that AGWS properly reimbursed – with, the reader will recall, warehoused funds of JCR - for repair costs incurred in servicing customers with American Guardian warranties. That has no bearing on whether, in the aggregate, AGWS failed to monitor competently JCR's aggregate loss ratio. Defendants' defense to breach is *not* that AGWS failed to pay claims for repairs. Instead, they argue that AGWS - as clearinghouse for all payments, investigation, and claims administration – materially breached the Dealer Agreement by failing to monitor whether JCR was suffering excessive losses in the aggregate over the life of its deal(s) to peddle American Guardian warranties.

And all this says nothing of Defendants' other factually supported affirmative defenses, such as estoppel and accord and satisfaction. For example, Defendants proffer unrebutted

affidavit evidence that at least Stewart, on behalf of Plaintiffs, represented that JCR would be excused from further contractual obligations if it "met the total production requirement in the production agreement between the parties sooner than the sixty months provided for in the agreement." (Defs.' Br. at Ex. B ¶ 6.)  By affidavit, Rosario similarly avers that he paid off this outstanding obligation by remitting to Plaintiffs the amount claimed for breach of the Production Agreement; Plaintiffs themselves characterize the minimum warranty sales requirement as the only "production requirement" in the Production Agreement.  (Defs.' Br. at Ex. A ¶ 10; Pls.' Reply at 6 (noting that there are "two requirements":  a "minimum production requirement" and a "separate exclusivity requirement").)  Plaintiffs do not argue that they never made this representation or that it was somehow dependent on other conditions.  Nor have they introduced affidavits relevant to the issue.  As such, Plaintiffs have not created a genuine issue of material fact sufficient for an evidentiary hearing.  *See, e.g., Dexia Credit Local v. Rogan,* 602 F.3d 879, 884 (7th Cir. 2010) ("[T]he court need not conduct an evidentiary hearing unless one is called for as a result of a fact issue created by the response to a motion for a preliminary injunction."); *Ty, Inc.,* 132 F.3d at 1171 (holding that the party seeking the evidentiary

hearing must demonstrate that it has "and intends to introduce evidence that if believed will so weaken [the other's] case as to affect the judge's decision on whether to issue the injunction"). This means that the evidence before the Court speaks with only one voice on these affirmative defenses, and that voice at this stanza of the case drowns out any prospect of Plaintiffs prevailing on the merits of their breach-of-contract claim.

Thus, by introducing inapposite affidavits or, alternatively, no evidence at all, Plaintiffs fail to show a likelihood that they will overcome Defendants' defenses to breach and excuses for non-performance, and thus prevail on the merits of their breach-of-contract claim. As such, their Motion for a preliminary injunction is denied.

### b. No Adequate Remedy/Irreparable Harm

Even if Plaintiffs had shown some likelihood of prevailing on the merits, their Motion has other coverage gaps. Arguing for an inadequate legal remedy and the existence of irreparable harm, Plaintiffs contend that damages flowing from Defendants' alleged breach of the Production Agreement are incalculable; that their sales of competing warranty products is injuring American Guardian's goodwill, advertising, and name recognition; and that irreparable harm is the clear result. To minimize the

crater left by their exact plea for damages in the legal requisites for a preliminary injunction, Plaintiffs claim that damages from Defendants' violation of their exclusivity obligation are not factored into those calculations, which instead reflect only the minimum contract sales required under the Production Agreement. These arguments are unavailing either conceptually or for lack of factual support.

As an initial matter, preventing Defendants from selling APCO warranties does nothing to redress Plaintiffs' lost sales over and above the minimum production requirements. If Defendants are enjoined from selling APCO (or other competitors') warranties, then Plaintiffs' alleged injury – denial of incremental profits on JCR's warranty sales – would still continue unabated. (One might also understand Plaintiffs' plea for relief as flunking the balancing-of-hardships factor, because prohibiting JCR's sales of competing warranty products merely denies Defendants a necessary source of funding without redressing a substantial portion of Plaintiffs' allegedly incalculable injury.) To the contrary, these losses can be compensated purely by money damages later at trial, perhaps with the help of an expert. *See, e.g., Sampson v. Murray,* 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not

enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). That some uncertainty may inhere in determining Plaintiffs' lost profits does not move the needle, because calculating lost profits often abjures outright certainty. *See, e.g., Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 770 N.E.2d 177, 199 (Ill. 2002) ("Lost profits, by their very nature, will always be uncertain to some extent and incapable of calculation with mathematical precision.") (citation omitted); *Royal's Reconditioning Corp., Inc. v. Royal,* 689 N.E.2d 237, 240 (Ill. App. 1997) ("Being merely prospective, lost profits will to some extent be uncertain and incapable of calculation with mathematical precision.") (citation omitted). And Plaintiffs have not adduced any evidence tending to show that waiting until final judgment to award such lost profits fails to redress their injury in the interim. *See, Roland Machinery Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386 (7th Cir. 1984) ("Only if he will suffer irreparable harm in the interim – that is, harm that cannot be prevented or fully rectified by the final judgment after trial – can he get a preliminary injunction. Where the only remedy sought . . . is damages . . . [t]he question is then

whether the plaintiff will be made whole if he prevails on the merits and is awarded damages.").

Perhaps as a consequence, Plaintiffs claim that JCR's sales of APCO warranties inflict irreparable damage to American Guardian's goodwill and marketplace recognition. (*See,* Pls.' Mot. at 7-8.) The Seventh Circuit has indeed held that "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation, and loss of goodwill." *Ty, Inc.,* 237 F.3d at 902; *see also, Hess Newmark Owens Wolf, Inc. v. Owens,* 415 F.3d 630, 632-33 (7th Cir. 2005) ("[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'") (citation omitted). However, the movant must nonetheless make a threshold "showing [of] injury to goodwill" by submitting some evidence that raises its claim to loss of goodwill above mere speculation. *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1140 (7th Cir. 1994); *see also, E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.,* 414 F.3d 700, 705-06 (7th Cir. 2005) (holding that a plaintiff may not "obtain a preliminary injunction by speculating about hypothetical future injuries"); *Carlson,* 2016 WL 7212522 at *7 ("In addition, [the plaintiff] has not submitted any evidence . . . concerning loss of goodwill.").

Alleged violation of an exclusivity arrangement, without more, is insufficient to establish irreparable harm to goodwill. *See, e.g., Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1263-64 (10th Cir. 2004) (noting that the grant of a permanent injunction in *Walgreen Co. v. Sara Creek Prop. Co.,* 966 F.2d 273 (7th Cir. 1992), relied on evidence of breach of an exclusivity clause, loss of goodwill, erosion of customer base, and diminution of corporate image)).

Plaintiffs here offer only the naked assertion that selling APCO warranties during the time period in which, absent the alleged breach, JCR would otherwise be subject to the Production Agreement's exclusivity clause, creates incalculable damages to American Guardian's market recognition and goodwill. There is nothing before the Court establishing a "serious risk to . . . significant goodwill" sufficient to constitute irreparable harm. *Girl Scouts,* 549 F.3d at 1089. This is in contrast to cases Plaintiffs cite, such as *U-Haul Co. of Cent. Illinois v. Hindahl,* 413 N.E.2d 187 (Ill. App. 1980). The court in that case enjoined two rental car dealerships from selling "Jartran" rentals instead of U-Haul rentals. Its holding was premised on three bits of evidence: first, U-Haul's Yellow Pages advertising "specifically identified" the defendants' business locations "as U-Haul dealerships and listed their telephone

numbers as U-Haul numbers"; second, Yellow Pages advertising and repeat business were integral to the trailer equipment rental business; and third, a significant number of customers seeking to do business with U-Haul were thereby "diverted to a competitor." *See, id.* at 192; *accord, Budget Rent A Car Corp. v. Harvey Kidd Auto,* 249 F.Supp.2d 1048, 1050 (N.D. Ill. 2003).

While true that the movant need not show, for example, that "we lost the Philadelphia advertising business of Warner Bros. to THA as a result of Owens's work for our rival," *Hess,* 415 F.3d at 632, it does need to offer evidence consistent with a "clear showing" that irreparable harm to goodwill is more than merely "a possibility." *D.U.,* 825 F.3d at 339. At the very least, the movant must do more than conclusorily assert that it possesses customer goodwill. Here, by contrast, that is all Plaintiffs have done. Unlike in *U-Haul,* there is no evidence of customer diversion to JCR based on a desire for American Guardian warranties; nor does anything in the record suggest that warranty companies depend on repeat business. Indeed, the steep, long-term financial commitment typically associated with an automobile purchase contrasts markedly with the conditions prevailing in the truck and equipment rental market. Finally, there is no evidence that American Guardian has longstanding relationships with customers that JCR's sales of APCO warranties

interfere with. Other courts have denied preliminary relief under circumstances similar to those at play here. *See, e.g., Carlson,* at *7 & n.8 (holding, despite a hearsay statement that the alleged breacher solicited the plaintiff's former customer, that the competitive nature of the industry and the plaintiff's failure "to establish customer goodwill" made it unclear whether future harm "eludes calculation because it is speculative" or because "if it occurred, it could not be quantified") (internal quotation marks omitted); *Budget Rent A Car,* 249 F.Supp.2d at 1050-51; *Baskin Robbins, Inc. v. Patel,* 264 F.Supp.2d 607, 609-611 (N.D. Ill. 2003) (refusing to conclude that Baskin Robbins would be irreparably harmed by a franchisee's termination of the franchise agreement, which contained a non-compete, and establishment of a competing ice cream store at the same location).

Grasping for some protectable interest in JCR's sales of American Guardian contracts, Plaintiffs contend that "[t]he product Defendants were selling was and is in fact proprietary and unique." (Reply at 7.) The uniqueness of American Guardian products aside, JCR selling an altogether different product does not irreparably impinge on any protected interest of Plaintiffs. Defendants are not alleged to be unlawfully using American Guardian's trade names, promotional materials, and other

proprietary information. They are not alleged to have misappropriated American Guardian's trade secrets, continued to use its confidential information, or otherwise purloined its intellectual property. On the contrary, Plaintiffs' evidence establishes that Defendants are now offering "brochures, marketing and advertising material for Automobile Protection Corporation (APCO) – Easycare Contracts." (Mot. at Ex. 4 ¶ 6.) Without more, the uniqueness of American Guardian warranties does not undermine the efficacy of Plaintiffs' remedy at law. *Cf., e.g., Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.,* 994 F.2d 1476, 1498 (10th Cir. 1993) (loss of uniqueness in marketplace satisfied irreparable harm factor *where the plaintiff established harm to goodwill* and difficulty in evaluating damages) (emphasis added); *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907-09 (2d Cir. 1990) (loss of unique product and goodwill supports finding of irreparable harm when customers indicate a strong preference for the product and threaten discontinuation of business relationship); *A.L.K. Corp. v. Columbia Pictures Indus., Inc.,* 440 F.2d 761, 763-64 (3d Cir. 1971) (finding in the case of a unique motion picture that the plaintiff had an adequate remedy at law because it would only suffer lost profits).

Given the dearth of evidence specific to the car warranty business in general or American Guardian's business in particular, Plaintiffs would have this Court as a matter of law transmogrify any alleged breach of an exclusivity agreement into irreparable harm to goodwill so long as the alleged breach is accompanied by sale of a competing product within the term of the erstwhile contract. This seems anathema to business realities. Whenever a going concern – particularly a retailer – (allegedly) breaches an exclusivity clause, to remain solvent it must make some attempt to cover prior to waiting until expiration of the breached contract's term or final resolution of the ensuing litigation. Similarly, any (alleged) breach of a supply agreement carries with it the potential for diminution in the supplier's market recognition; after all, it has lost an avenue to offer its products to end users. But whether this harm incalculably damages its goodwill or marketplace recognition must rest on something more than the mere loss itself – namely, the particular factual circumstances of the parties and their lines of business. *Reliable Fire Equip. Co. v. Arredondo,* 965 N.E.2d 393, 401-03 (Ill. 2011) (grounding the inquiry into the protectable interest in customer relationships in "the totality of the facts and circumstances of the individual case"); *cf. Hendricks Music Co. v. Steinway, Inc.,*

689 F.Supp. 1501, 1512 (N.D. Ill. 1988) ("[T]he evidence shows that Hendricks' entire business and reputation have been based on the prestige of the Steinway line. The loss of goodwill Hendricks will suffer if it must discontinue carrying that line is thus alone significant and impossible to quantify.").

Therefore, Plaintiffs have not furnished the Court with evidence sufficient for it to find a "clear showing of need" necessary to justify imposition of a preliminary injunction against JCR selling APCO warranties. *Cooper v. Salazar,* 196 F.3d 809, 813 (7th Cir. 1999) (citing *Mazurek,* 520 U.S. at 972). As such, Plaintiffs' Motion for a Preliminary Injunction is denied.

## IV.   CONCLUSION

For the reasons stated herein, Plaintiffs' Motion to Dismiss [ECF No. 34] and Motion for a Preliminary Injunction [ECF No. 27] are denied.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: May 22, 2017