**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AMERICAN GUARDIAN WARRANTY SERVICES, INC. and AMERICAN GUARDIAN FUNDING CORPORTATION<br><br>        Plaintiffs,<br><br>        v.<br><br>AUTOMOBILE PROTECTION CORPORATION, INC.,<br><br>        Defendant. | Case No. 16 CV 11407<br><br>Judge Harry D. Leinenweber |

**MEMORANDUM OPINION AND ORDER**

This case involves a car dealership, its exclusive provider of limited warranties (Plaintiff American Guardian Warranty Services), and the company that allegedly interfered with the relationship between the two (Defendant Automobile Protection Corporation). For the reasons stated herein, Defendant's Motion for Summary Judgment (Dkt. No. 184) is denied.

### I.    BACKGROUND

This lawsuit began in 2016, when Plaintiffs American Guardian Warranty Services, Inc. and American Guardian Funding Corporation (collectively, "American Guardian" or "AGW") sued JCR-Wesley Chapel, LLC, Jesus Rosario, and Cynthia Rosario (collectively, "the Dealership Defendants") for breach of contract. JCR-Wesley Chapel is a Florida limited liability company that, at the times relevant to this lawsuit, owned a car dealership. Jesus "Jay"

1

Rosario is the owner of JCR-Wesley Chapel. Cynthia Rosario is Jesus's former spouse. (Subsequent references to "Rosario" in this opinion are to Jesus Rosario.)

American Guardian provides financing and warranty servicers to car dealerships. This suit arose out of a series of contracts between American Guardian and the Dealership, in which American Guardian gave the Dealership a loan in exchange for the Dealership's promise to sell exclusively American Guardian contracts to its customers. The first contract was formalized on November 7, 2013, when the Dealership Defendants entered into a "Dealer Agreement" with American Guardian. (Pls.' Resp. to Def.'s Stmt. of Facts ("DSOF") ¶¶ 2-3, Dkt. No. 189.) The Dealer Agreement provided that American Guardian would loan the Dealership $300,000 in exchange for the Dealership selling exclusively American Guardian warranty products for five years. (*Id.*) On November 14, 2014, the Dealership and American Guardian entered into a "Dealer Agreement Funding Addendum," which extended the exclusive-sale period in exchange for an additional $1,030,601.15 loan. (DSOF ¶ 5.) The Dealership signed a third Addendum Agreement with American Guardian on December 15, 2015, for an additional $716,357.52 loan. (*Id.* ¶ 6.) The Dealer Agreement and the following Addendums all contained the following language:

> For a period of sixty (60) months from the effective date, Dealer agrees to provide substantially all vehicle service contracts, limited warranty, guaranteed asset

2

> protection[], certified ancillary product production through American Guardian Warranty Services, Inc. or its approved product providers. For purposes of this provision, substantially all shall mean [95%] of vehicle service contracts, limited warranty, guaranteed asset production[], certified ancillary product production produced by Dealer.

(Def.'s Resp. to Pls.' Stmt. of Add. Facts ("PSOAF") ¶ 6, Dkt. No. 195.) Thus, the final 2015 agreement obligated the Dealership to sell American Guardian products until December 2020. (PSOAF ¶¶ 5-6, 11.)

The dispute between the parties began brewing in early 2016. Rosario approached American Guardian for additional funding for the Dealership. (PSOAF ¶ 12.) Around the same time, in April 2016, representatives from Automobile Protection Corporation, Inc. (APCO) visited the Dealership. (PSOAF ¶¶ 15-16.) Like American Guardian, APCO is an automobile warranty provider that provides loans to car dealerships in exchange for exclusive sales agreements. Joey Falcon was the Dealership's general manager at the time. (PSOAF ¶ 11.) Falcon had reviewed the Dealership's contracts with American Guardian and understood that the exclusive sales term continued through December 2020. (*Id*.) Still, Falcon met with an APCO Vice President, Pete Lee, and APCO salesperson, Rob Mirra, and discussed how a loan advance from APCO could be helpful in funding additions to the Dealership. (PSOAF ¶ 16.)

On April 30, 2016, Lee sent an email to Mirra stating, "I wanted to let you know that the loan for [the Dealership] is

approved. We are working on loan agreements and should have them next week." (PSOAF ¶ 18.) On May 3, 2016, APCO sent its rate quotes and books to the Dealership. (*Id.* ¶ 20.) On May 13, 2016, Mirra received a copy of the Dealer Agreement between the Dealership and American Guardian. (*Id.* ¶ 21.) Mirra circulated a copy of the contract to other APCO executives. (*Id.* ¶ 21.) On October 1, 2016, APCO entered into an exclusive contract with the Dealership to sell the same type of warranty products the Dealership was still obligated to sell for American Guardian. Soon after, American Guardian sued the Dealership Defendants for breach of contract.

APCO was not originally a party to this suit. In their Second Amended Complaint, American Guardian added APCO as a defendant. (*See* Sec. Am. Compl., Dkt. No. 101.) American Guardian alleges that APCO intentionally induced the Dealership Defendants to breach their contract with American Guardian. American Guardian asserts two claims against APCO: tortious interference with an existing business relationship, and tortious interference with a contract.

The Court has issued three prior rulings in this case. (*See* May 22, 2017, Mem. Op., Dkt. No. 55; June 5, 2018, Mem. Op, Dkt. No. 124; Oct. 24, 2018, Order, Dkt. No. 142.) In denying APCO's earlier motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court held as follows: (1) the Dealership Agreement is not unconscionable; (2) American Guardian pleaded each element

of a claim for tortious interference with contract; and (3) American Guardian's claims are not barred by the lawful competition privilege. (*See* Oct. 24, 2018, Order.)

In June 2019, the Dealership Defendants settled with American Guardian and were dismissed from this case. (*See* Minute Entry, Dkt. No. 173.) The case between American Guardian and APCO is set to begin a jury trial on March 2, 2020. APCO now moves for summary judgment, arguing that American Guardian has insufficient evidence to support a claim for tortious interference with contract or business relationship.

## II.    STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Levy v. Marion Cty. Sheriff*, 940 F.3d 1002, 1008–09 (7th Cir. 2019) (citing Fed R. Civ. P. 56(a)). The Court considers the entire evidentiary record and draws all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Inferences supported only by speculation or conjecture will not suffice. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721–22

(7th Cir. 2018). Summary judgment is warranted only if the evidence is such that a reasonable jury could not return a verdict for the nonmoving party. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### III. DISCUSSION

Interference with contract and interference with business relations (sometimes called prospective economic advantage) are related torts. *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 731 (7th Cir. 1999). In Illinois, the elements of a tortious interference with an existing contract claim are:

> (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages.

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989); *A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1404 (7th Cir. 1992). In a tortious inference with a business relationship or prospective economic advantage claim, the plaintiff must establish (1) the existence of a valid business relationship (not necessarily evidenced by an enforceable contract) or expectancy; (2) the knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the

6

party whose relationship or expectancy has been disrupted. *Curtis 1000, Inc. v. Suess*, 843 F. Supp. 441, 452 (C.D. Ill.), *aff'd*, 24 F.3d 941 (7th Cir. 1994).

### A. Causation

APCO's primary argument is that American Guardian cannot establish the required causation for either tort; that is, that APCO's interference caused the Dealership's breach of contract. APCO asserts that Rosario, the Dealership's principal, had already decided to breach the Dealership's contract with American Guardian before entering into talks with APCO. APCO's primary support for this argument is Rosario's June 3, 2019, deposition, in which he testified:

> Q: By the time Rob Mirra started talking to you about the APCO warranty program, had you already decided to move on to a different company?
> A: Yes.
>
> …
>
> Q: And you'd already decided you were moving on [from AGW] but you were just trying to work your way out of that relationship, true?
> A: Correct. I wanted it to be mutually acceptable.
>
> …
>
> Q: [APCO] contacted you, you guys got in contact somehow?
> A: No. We had made the decision we were done with AGW. We had been talking to a couple different vendors.

(June 3, 2019, Rosario Dep. 44:11-14; 49:18-22; 71:24-72:4. Ex. H to DSOF.)

7

APCO is correct in the sense that Rosario's deposition testimony is unequivocal: he had already decided to breach the American Guardian contract before beginning talks with APCO. However, as American Guardian points out, there is conflicting evidence in the record. For example, in his January 10, 2018 deposition, Rosario testified that he did not reach out to APCO; APCO initiated communication with him:

> Q: When did you first reach out to… APCO?
> A: I did not reach out to them.
> Q: Did they reach out to you?
> A: Multiple agencies always – they come around all the time.

(Jan. 10, 2018, Rosario Dep. 177:4-9, Ex. A to DSOF.) But Mirra testified that the opposite was true:

> Q: Well, you solicited JCR-Wesley Chapel.
> A: I didn't solicit anybody. Jay [Rosario] called me.
> …
> Q: Did you ever solicit JCR-Wesley Chapel to come work or do business with APCO while they were under contract with American Guardian?
> A: No.

(June 19, 2019, Mirra Dep. 64:13-24, Ex. L to DSOF.) Thus, there is an issue of fact regarding whether the Dealership or APCO initiated this relationship, and why.

There is a further issue of material facts on the causation question. A sub-plot running through this case—and the subject of a former counterclaim that has since been dismissed since the Dealership Defendants settled—was the Dealership Defendants' contention that in 2013, at the beginning of their contractual

relationship, American Guardian promised to set up a reinsurance company for JCR-Wesley Chapel, LLC. The reinsurance company would allow JCR to retain the warranty payments paid by customers with American Guardian contracts and earn investment income on them. Several years passed and the reinsurance company still had not been established (the parties dispute whether this was American Guardian's or the Dealership Defendants' fault). However, Falcon, the Dealership's general manager, did ultimately set up the reinsurance company with American Guardian in the spring of 2016. And Falcon's deposition testimony on this subject indicates that Rosario had not made up his mind at that point about whether to breach the American Guardian agreement:

> Q: In April and May [of 2016], we've established that you went ahead and spoke with people at [AGW], received documentation and started and actually formed a reinsurance company ultimately, didn't you?
> A: Yes.
> Q: And did you do all the—did you do that all the time knowing you planned to go to a different—a competitor?
> A: No.

(Jan. 24, 2018, Falcon Dep. 76:18-77:3, Ex. 9 to PSOAF.) This testimony suggests facts in dispute regarding whether the Dealership planned to breach its agreement with American Guardian prior to April or May of 2016.

Additionally, emails from Mirra to Rosario in September of 2016 indicate that Mirra believed Rosario had not yet made up his mind about what to do about the American Guardian contract. On

9

September 7, 2016, Mirra sent Rosario and Falcon an email that read, in part:

> I have been giving a bunch of though[t] on this AGW contract and your potential liability if worst case scenario happens. The fact is you have *made zero off this relationship thus far*, other than paying off your loan and doing a direct write, that has only benefited AGW. … The point of this is all to show that even if worst case scenario happens you would still be able to pay the fine and have more money than you ever did with them. *There comes a point when severing toxic business relationship is the only option*.

(PSOAF ¶ 26 (emphasis added).) The italicized portions of the above email appear to show Mirra encouraging or persuading Rosario to breach the American Guardian contract. Mirra would not need to convince Rosario to breach the agreement if Rosario had already decided to do so months before.

On September 20, 2016, Mirra sent a follow-up email to Rosario that further indicates an attempt to convince him to breach the American Guardian contract:

> Jay I have a meeting tomorrow morning and I did not hear back from you *what your intentions are*? I want you to know I will still look out for you no matter what. That being said, *regardless the outcome of any litigation* look at the proforma I sent you. You are getting a million bucks interest free!!! Plus a real offshore position that will net you millions. You can invest this free money however you wish. Worst case you could *still pay off whatever settlement if any you are hit with*. I would never steer you wrong, your [sic] my friend to till the end, I hope you know that. I just don't want this to pass you.

(PSOAF ¶ 27 (emphasis added).) Again, such an email would not be necessary if Rosario had already decided to terminate the

Dealership's relationship with American Guardian. Mirra's emails undercut APCO's assertion that "Rosario had already determined [the Dealership's] future business relations with American Guardian would end." (Def.'s Mot. at 10, Dkt. No. 185.) And the fact that the Dealership ended up signing with APCO may also be indicative of causation—perhaps Rosario was not sure he was going to leave American Guardian until APCO offered him a specific deal. Ultimately, the causation question at issue in this case turns on weighing conflicting testimony between Rosario, Falcon, and Mirra. And summary judgment is "notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985) (citing *Pfizer, Inc. v. Internat'l Rectifier Corp.,* 538 F.2d 180, 185 (8th Cir. 1976)). There is sufficient evidence in the record for a reasonable jury to conclude that APCO caused Rosario's decision to breach the Dealership's contract with American Guardian. Therefore, this is a question of fact best left for the jury.

### B. Intent

Next, APCO contends that American Guardian cannot establish that APCO *intended* to prevent the Dealership from performing its contract with American Guardian—another required element in both tortious interference in contract and business relations. Intent to induce requires "some active persuasion, encouragement, or

11

inciting that goes beyond merely providing information in a passive way." *Webb v. Frawley*, 906 F.3d 569, 579 (7th Cir. 2018) (citing *In re Estate of Albergo*, 656 N.E.2d 97, 103 (Ill. 1995); Restatement (Second) of Torts § 766 cmt. h ("The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.")).

There is sufficient evidence to allow a reasonable jury to find APCO had the requisite intent in this case. On the day Mirra received a copy of the Dealership's contract with American Guardian, he sent a copy of that contract to two APCO executives, along with an email that read:

> Good morning Gents. I have a signed copy of Jay's agreement with AGW[]. I hope we can identify some "outs." In addition if we can point out any breach of contract on the part of AGW[]. Any help would sure be appreciated at this point. Thanks in advance guys.

(PSOAF ¶ 23.) APCO's desire to identify breaches, or "outs," in the Dealership's contract with American Guardian indicates a desire to deter the Dealership from completing that contract. Moreover, Mirra's two September 2016 emails to Rosario further support the intent element. Mirra told Rosario that he had made "zero off this relationship" with American Guardian, and "[t]here comes a point when severing toxic business relationship is the only option." (PSOAF ¶ 26.) Mirra then went on to tell Rosario

12

that if he signed with APCO, Rosario would "[get] a million bucks interest free!!! … You can invest this free money however you wish. Worst case you could still pay off whatever settlement if any you are hit with." (PSOAF ¶ 27.) This email is certainly suggestive of an intent to induce a breach. Therefore, there remains a genuine issue of material fact regarding APCO's intent to cause the Dealership's breach.

A final note about the elements of these torts. APCO appears to argue, in its response to American Guardian's statement of additional facts, that the contract between American Guardian and the Dealership was invalid in the first instance—or at least, that the contract did not mean what it said. In APCO's response to American Guardian's Statement of Additional Facts, APCO labeled any fact related to the terms of American Guardian's contracts with the Dealership as "disputed." (PSOAF ¶¶ 5, 7, 14, 30-31.) The basis of this "dispute" is APCO's assertion that the Dealership could never have agreed to sell 95% of warranties through American Guardian, as required by the Dealer Agreement, because the Dealership was simultaneously obligated to sell 25% of its warranties through Nissan. (*Id*.) See for example APCO's response to American Guardian's paragraph 14:

> At that time of the additional proposals, JCR was still under the exclusive December 15, 2015 Dealer Agreement, which was never terminated or rescinded.

> RESPONSE: Disputed. Selling AGW products exclusively during the AGW contract term was not possible because 25% of the warranties JCR was obligated to simultaneously sell were Nissan. Rosario discussed this fact with AGW and AGW did not object.

(PSOAF ¶ 14.)

Thus, it appears APCO is arguing that American Guardian cannot establish the first element of both tortious interference with contract: an existing contract between American Guardian and the Dealership. However, "opinion, suggested inferences, legal arguments and conclusions are not the proper subject matter" of a Local Rule 56.1 statement. *Phillips v. Quality Terminal Servs.*, LLC, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) (citation omitted). Fact statements are designed to "assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Markham v. White*, 172 F.3d 486, 490 (7th Cir. 1999). Burying this argument in a response to a statement of material facts is an inappropriate use of a fact statement and is insufficient to brief the issue for the Court's consideration. Therefore, to the extent APCO intended to make this argument at summary judgment, it is waived. *United Cent. Bank v. Davenport Estate LLC*, 815 F.3d 315, 318 (7th Cir. 2016) ("perfunctory and undeveloped" arguments are waived).

## C. "Industry Practice"

Finally, APCO argues that American Guardian engages in precisely the same behavior that American Guardian claims to be tortious in this case. APCO argues that warranty providers, American Guardian included, routinely call on dealerships that are already in exclusive sales agreements in an attempt to win their business. APCO can rest assured that an outcome for the Plaintiffs in this case would not put the general industry practice in sales of soliciting new clients at risk. This litigation concerns only the specific acts of APCO's employees and whether those actions crossed the line from routine salesmanship and persuasion into inducing contract breach.

## IV. CONCLUSION

Defendant's Motion for Summary Judgment (Dkt. No. 184) is denied. This case will proceed to trial on March 2, 2020.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 11/19/2019

15